UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MELVIN C. MESTETH, | ) | CIV.  05-5026-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER AFFIRMING THE |
| JO ANNE B. BARNHART, | ) | COMMISSIONER'S DECISION |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Melvin C. Mesteth, moves for reversal of the Commissioner of Social Security's decision denying his application for supplemental security income (SSI) under Title XVI of the Social Security Act.  Defendant opposes the motion.  The court affirms the Commissioner's decision denying benefits.

**FACTS**

Mesteth was born on November 25, 1981.  When he was an infant, he had a severe case of pneumonia and chickenpox.  The infection damaged the nerves in his ears, leaving him nearly deaf.  Mesteth also has difficulty speaking.  Mesteth graduated from high school in May 2001, when he was 19 years old.  He was in special education from elementary school through high school.  When Mesteth applied for SSI he was living with his parents.  (Tr. 62, 64-65, 68-69, 106).

Mesteth filed an application for supplemental security income under Title XVI of the Act on April 11, 2001.  He alleged that he could not work because he was deaf.  Mesteth completed some of the application forms himself, but he had his step-brother John Swimmer fill out the daily activities questionnaire for him.  Mesteth reported that he takes care of his own personal hygiene and occasionally cooks.  He cleans the house by himself and repairs things around the house, but he reported that he sometimes needed help completing these chores.  Mesteth reported taking walks or sitting outside for four to five hours a day if the weather was nice.  Mesteth enjoys spending time with his family and friends and visits with his friends from school at his house.  Some of his relatives are in wheelchairs, so he helps them by bringing them food and coffee.  Mesteth was not able to compete in sports while he was in school, but he does play baseball and basketball at home with his siblings.  Mesteth reported having problems concentrating in school and reading instructions. He could follow verbal instructions as long as he could read the speakers' lips and they spoke in a loud voice.  When asked how his condition keeps him from working, Mesteth stated "I can work but limited activity.  I was in high school and I graduate[d] on May 19, 2001."  (Tr. 65, 79-83, 87).

On August 9, 2001, Mesteth saw Bruce H. Allen, M.D., for a hearing test and medical examination.  Dr. Allen noted that Mesteth had used a hearing aid while in school and that his hearing problems were related to the severe

2

chickenpox Mesteth had contracted as an infant.  Dr. Allen noted that "the feeling of examiners since is that his physical locomotion and hearing problems were a residual of that infection.  There may be an element of cerebral palsy as well at least from the gait change that was observed as he came to the clinic." (Tr. 106).

Mesteth was not wearing his hearing aid during the visit.  Mesteth did not like using the hearing aid because of excessive background noise. Dr. Allen reported that Mesteth appeared to understand him if he spoke to Mesteth in a loud voice.  Mesteth showed consistent "articulation errors" in his speech, due to his nerve deafness.  A closer exam of Mesteth's ears revealed that they were filled with earwax to the point of obstructing his hearing aids. After Mesteth's ears were cleaned, Dr. Allen performed a hearing test. Mesteth's "understanding scores questionably were 84% [once] adequate volume was used and he is fortunate in that regard."  (Tr. 106).

Dr. Allen noted that Mesteth had "severe and permanent bilateral sensorineural deafness, cause undetermined but suspect central nervous involvement as a complication of measles/chickenpox at age 4 months." Dr. Allen did not know whether the gait problem was related to Mesteth's childhood illness.  Dr. Allen recommended that Mesteth use his hearing aids and have the earwax removed periodically so that the hearing aid would fit better.  Dr. Allen opined that Mesteth was "doing the best he can through

3

hearing aids but nerve deafness is a permanent source of poor understanding with background noise." Even with the best hearing aids, Mesteth would have problems understanding when there was background noise, because the hearing aids would make everything twice as loud but still not understandable. Accordingly, Dr. Allen opined that Mesteth was permanently disabled in spite of his best efforts to cope with hearing loss. (Tr. 107).

Mesteth saw Greg Swenson, Ph.D., for a psychological evaluation on August 10, 2001. Mesteth was not wearing his hearing aids and had a hard time communicating with Dr. Swenson, but he was accompanied by his father. Mesteth's father stated that "the hearing aids that were originally prescribed have become outmoded, and Melvin has not had current technology available to him." Mesteth had no significant medical history other than the hearing problem and abnormal gait. (Tr. 109-110).

Mesteth reportedly was capable of independent grooming and hygiene. His typical activities were playing basketball and helping his mother with housekeeping. Mesteth lived a relatively isolated life and had few visitors. His mood was described as usually pleasant. He appeared to be appropriately dressed and groomed for the exam and had a pleasant demeanor, but he had great difficulty hearing the examiner even when Dr. Swenson raised his voice. (Tr. 110).

Mesteth was not given verbal tests because he had trouble verbally responding to Dr. Swenson's questions.  Mesteth's performance IQ on a written test was 80, which was just within the average range.  His processing speed index was significantly below average, in the 2nd percentile.  Dr. Swenson opined that this may reflect impairment in attention and concentration. Mesteth had below average scores in concentration and visual memory tests. Overall, his test scores indicated that his "non-verbal intellectual abilities are largely within the average range."  Dr. Swenson noted that there "may be a deficit in attention and concentration."  He diagnosed an expressive language disorder and learning disorder, not otherwise specified.  Dr. Swenson opined that Mesteth would need assistance managing any benefits awarded to him. (Tr. 112-13).

On August 27, 2001, state agency consultant Jerome Buchkoski, Ph.D., reviewed Mesteth's records and completed a mental residual functional capacity (RFC) assessment.  Dr. Buchkoski checked the boxes indicating Mesteth was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and maintain concentration for extended periods.  He indicated Mesteth was not significantly limited in his ability to ask simple questions or request assistance. Dr. Buchkoski found no marked limitations and opined that Mesteth had a mental RFC consistent with the performance of job tasks.  (Tr. 122-24).

5

State agency consultant Jessie Easton, M.D., reviewed Mesteth's records and completed a physical RFC assessment on August 27, 2001.  Dr. Easton found no exertional limitations, postural limitations, manipulative limitations, environmental, or visual limitations.  Dr. Easton indicated that Mesteth's hearing was limited but that his speaking was unlimited.  Dr. Easton noted that Mesteth's hearing tests revealed "84% discrimination.  Claimant did not wear his hearing aids, and could potentially have some improvement with same."  (Tr. 116-17).

On October 23, 2001, F.R. Entwistle, M.D., reviewed the records and completed an RFC assessment.  The record indicated Mesteth had no limitations other than hearing loss.  Dr. Entwistle noted that hearing aids would provide some improvement.  On the same day, D.J. Soule, Ph.D., completed another review of Mesteth's records and opined that Mesteth had a learning disability.  Mesteth was mildly limited in his activities of daily living and maintaining social functioning, and moderately limited in maintaining concentration, persistence, and pace.  Dr. Soule found moderate limitations in Mesteth's ability to understand and remember detailed instructions, carry out detailed instructions, and concentrate for extended periods of time.  Dr. Soule saw no evidence of marked limitations in Mesteth's record.  (Tr. 126-30, 135-36, 141)

On March 27, 2002, Jose Lozano, M.D., examined Mesteth and completed an assessment of his mental and physical abilities to do work-related activities.  Dr. Lozano noted that "patient has deafness and would need to have instructions for his work clearly defined by speaking to him face front so that he can read lips."  He opined that Mesteth had a fair ability to follow work rules, relate to coworkers, deal with the public, interact with supervisors, deal with work stresses, function independently, and maintain concentration.

Dr. Lozano indicated that Mesteth had no physical limitations in his ability to lift or carry, stand, walk or sit.  Mesteth could frequently climb, stoop, kneel, balance, crouch, or crawl.  Mesteth's impairment did not prevent him from reaching, handling, feeling, pushing or pulling, or seeing, but did affect his ability to hear and speak.  Dr. Lozano indicated that Mesteth's deafness was his only physical problem.  (Tr. 161-63).

On May 20, 2002, Mesteth saw Norman N. Sorenson, MA, for an audiological examination.  Mesteth used his four-year-old hearing aid even though he had been prescribed a newer behind-the-ear hearing aid in September of 2000.  The exam revealed a severe to profound sensorineural hearing loss in both ears.  Sorenson noted that Mesteth benefitted from hearing aids but would still need to use visual cues to help him communicate.

Word recognition scores ranged from 60 percent to 76 percent when using the hearing aid.  He recommended that Mesteth use hearing aids that

work the best for him, and that the hearing aids be regularly cleaned and checked.  (Tr. 167).

Vocational expert William J. Tysdal responded to the administrative law judge's (ALJ's) interrogatories on January 6, 2003.  Tysdal stated that Mesteth could work as an electronics worker or cleaner/housekeeper.  Both jobs are light unskilled positions.  Tysdal reported that the "above jobs do not require talking or hearing to perform the work.  They are unskilled and any orientation or job task instructions could be transmitted via in writing [sic] or with raised voice (simple instructions)."  (Tr. 104).

## ALJ DECISION

Mesteth attended a hearing before the ALJ on April 4, 2002, in which he was represented by Rhonda Akers, who is not an attorney.  Akers spoke on his behalf.  After applying the sequential five-step evaluation process,[1] the ALJ concluded that Mesteth was not entitled to benefits.  First, the ALJ determined

---

[1]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

that Mesteth was not engaged in substantial gainful activity.  Second, the ALJ found that Mesteth suffered from hearing loss, a learning disability and an expressive language disorder that qualified as a severe impairment.  Third, the ALJ found that the impairment did not meet or equal the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, appendix 1 pertaining to hearing loss or learning disability.  Fourth, the ALJ determined Mesteth's RFC by reviewing medical records and testimony of witnesses.  Although Mesteth had no prior work experience, the ALJ concluded that Mesteth had the RFC for work that did not involve oral communication between supervisors, co-workers, or the general public.  Relying on testimony from the vocational expert the ALJ determined that Mesteth was capable of working as a cleaner/housekeeper or electronics worker.  Accordingly, Mesteth's application was denied on February 19, 2003.  The Appeals Council denied his request for review of the ALJ's decision on January 9, 2004.  (Tr. 2, 9, 21-24).

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389,

9

401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  See also Smith v. Shalala, 987 F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then

10

this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

Mesteth contends that the ALJ failed to develop the record as to Mesteth's abnormal gait and poor academic record and erroneously found that Mesteth's impairments were not presumptively disabling at step three in the five-step analysis.  Mesteth also contends that the ALJ's findings as to his RFC and the jobs he can perform are not supported by substantial evidence.  If the court does not order an award of benefits or remand on these grounds, Mesteth contends that his case must be remanded for consideration of new and material evidence regarding his gait problem.  The court affirms the ALJ's decision denying benefits and denies the motion to remand for consideration of new and material evidence.

## 1.    Alleged Failure to Develop the Record

It is well settled that the ALJ has a duty to develop the record fairly and fully, independent of the claimant's duty to argue his or her case.  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  Social Security proceedings are non-adversarial and the ALJ has no interest in denying benefits.  Id.  The district court may reverse the ALJ's decision for failure to develop the record "where such failure is unfair or prejudicial."  Id. (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)).  An ALJ may issue a decision without

obtaining additional medical testing as long as other evidence in the record provides a sufficient basis for the ALJ's decision.  Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir. 1999).

Mesteth argues that the ALJ should have obtained the results of psychological evaluations performed while he was in school and records related to his placement in special education.  Mesteth contends that the ALJ should have ordered more tests of his math and reading abilities.  Mesteth contends that the failure to obtain these records and order these tests led the ALJ to erroneously find that he had the General Educational Development (GED) level necessary to work as a housekeeper or electronics worker.

According to the Dictionary of Occupational Titles (DOT), an electronics worker position has a GED reasoning level 2, which requires the ability to "carry out detailed but uninvolved written or oral instructions."  DOT 726.687-010.  The position has a level 1 math requirement, which involves adding and subtracting two digit numbers and multiplying and dividing 10's and 100's by 2, 3, 4, or 5.  The language GED is a level 2, requiring the ability to read 190-215 words per minute, read adventure stories and comic books and read instructions for assembling model cars and airplanes.  The housekeeper position requires a GED reasoning level 1, which includes the ability to "carry out simple one or two-step instructions."  DOT 323.687-014.  It also requires a level 1 language and math GED.  A level 1 reading GED means the employee

12

must be able to recognize 2,500 two or three syllable words and read 95-120 words per minute.

In this case, the ALJ had the results of the psychological evaluation performed by Dr. Swenson, which included a functional assessment and mental status examination, a Wechsler Adult Intelligence Scale-III, and a Wechsler Memory Scale-III.  Mesteth's IQ was within the average range.  While there were some deficits in attention and concentration, and a portion of the adult intelligence test was very low, Dr. Swenson found that Mesteth's "non-verbal intellectual abilities are largely within the average range."  When Dr. Lozano examined Mesteth, he found that Mesteth's only work-related problem was his hearing impairment.  He opined that Mesteth's ability to understand and carry out job instructions was "fair."  Dr. Soule reviewed the records and found no marked limitations in Mesteth's mental abilities.

Although the examining physicians did not address the specific GEDs for the housekeeping or electronics worker positions, neither doctor opined that Mesteth had a disabling mental condition.  Because there was no evidence indicating Mesteth lacked the mental capacity to work as a housekeeper or electronics worker, the ALJ had sufficient evidence in the record to determine whether Mesteth was disabled.  See Warburton, 188 F.3d at 1051 (record containing results of one psychological exam is sufficient where there is no

evidence contradicting it); see also Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (record was sufficient because it contained no conflicting evidence).

In this case, Mesteth's main complaint was that he could not work because he was deaf.  Mesteth did not wear his hearing aid to the hearing before the ALJ, but he answered questions with the assistance of a non-attorney representative.  Although many of his answers were inaudible, and the ALJ had to repeat some his questions, Mesteth responded to questions from his representative and stated that he can hear people talking when he is wearing his hearing aid.  The ALJ ordered a consultative examination of his hearing problem.  (Tr. 31, 35).  The court finds that the examining physicians' reports provided enough information for the ALJ to fairly decide whether Mesteth was disabled.  See Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (rejecting claim that ALJ failed to develop record because ALJ ordered one consultive exam).

The ALJ relied on the testimony of vocational expert William J. Tysdal.  Tysdal reviewed Mesteth's limitations and stated that a person with Mesteth's mental abilities could work as a housekeeper or electronics worker.  He also stated in his interrogatories that talking or hearing was not necessary in these two positions.

Moreover, Mesteth has not explained how he was prejudiced by the ALJ's failure to obtain his special education records or his failure to order more

14

testing on his math and reading abilities.  See Snead, 360 F.3d at 838.

Accordingly, the court finds that the ALJ adequately developed the record.  In

the alternative, the court finds that Mesteth was not prejudiced by any failure

to develop the record.

## 2.    **Alleged Step Three Error—Presumptively Disabling Condition**

Mesteth alleges that the ALJ failed to consider whether his speech

impairment was presumptively disabling under the listing criteria for speech

impairments and organic mental disorders.  If a claimant has an impairment

that meets or equals a presumptively disabling impairment listed in the

regulations, he or she is disabled.  Baker, 159 F.3d at 1143-44.  "Although it is

preferable that ALJs address a specific listing, failure to do so is not reversible

error if the record supports that overall conclusion."  Pepper v. Barnhart, 342

F.3d 853, 855 (8th Cir. 2003).  The burden of proof is on the claimant to

establish that his or her impairment meets all the requirements of the listing

with medical evidence.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.

2004).

Disability due to loss of speech is defined as the "inability to produce by

any means speech that can be heard, understood, or sustained."  20 C.F.R. Pt.

404, Subpt. P, App. 1, Listing 2.09.  Mesteth contends that because

Dr. Swenson noted that he was "essentially mute," his family members

sometimes had trouble understanding him, and the ALJ had trouble

15

understanding him at the hearing, there is a reasonable likelihood that he met the presumptive listing for loss of speech.

Dr. Swenson wrote "Melvin demonstrated a pleasant demeanor, smiling and acting generally cheerful, although he was essentially mute."  (Tr. 112).  Dr. Swenson did not test Mesteth's ability to speak, so this statement cannot be considered medical evidence to support a presumptive finding for disability due to loss of speech.  The ALJ's difficulty hearing Mesteth and Mesteth's allegation that they had trouble understanding him are not medical evidence that Mesteth met the 2.09 listing requirements.  See Johnson, 390 F.3d at 1070 (noting that the claimant must present medical findings equal in severity to the listing criteria); see also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (ALJ does not have to give significant weight to statements that constitute legal conclusions or are not supported by medical data).  Accordingly, the court finds that the ALJ did not commit reversible error by failing to address the loss of speech listing requirements.

As to the alleged organic mental disorder, Mesteth contends that he may have met the "B" or "C" requirements for a presumptively disabling condition as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02.  To meet the requirements for the "B" listing, Mesteth must show one of the part "A" criteria and two of the four "B" criteria.  Id.  Under part "A", Mesteth must show one of the following: disorientation to time and place, memory impairment,

16

hallucinations or delusions, change in personality, disturbance in mood, impairment in impulse control, and loss of IQ or overall impairment clearly within the severely limited range.  Dr. Swenson's examination revealed that Mesteth's IQ was average and there was no other medical evidence that would support a finding of mental disability in the 12.02 A listing.

Under part "B", Mesteth must show marked limitations in two of the following four areas: activities of daily living, maintaining social functioning, maintaining concentration, or repeated episodes of decompensation.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02 B.   Dr. Swenson found that Mesteth was limited in his ability to concentrate, but he did not find that Mesteth was markedly limited in this area.  None of the examining or consulting physicians found marked limitations in any of the areas necessary to find a presumptively disabling mental condition.

Mesteth contends that he may meet the requirements for listing 12.02 C, because he was diagnosed with a learning disorder, was placed in special education, and still lives with his parents even though he has finished high school.  A claimant is presumptively disabled if he or she meets the following requirements:

> Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.    Repeated episodes of decompensation, each of extended
      duration; or
2.    A residual disease process that has resulted in such
      marginal adjustment that even a minimal increase in mental
      demands or change in the environment would be predicted
      to cause the individual to decompensate; or
3.    Current history of 1 or more years' inability to function
      outside a highly supportive living arrangement, with an
      indication of continued need for such an arrangement.

Although Mesteth lives with his parents, none of the examining physicians opined that he would be unable to live on his own.  There is no medical evidence in the record that would support a finding of disability under the 12.02 C listing.  In his meeting with Dr. Swenson and in his disability application, Mesteth reported that he was able to take care of his personal needs, such as hygiene and cooking, and that he helped keep the house clean.  Because the record does not support a finding of disability under the 2.09 or 12.02 listings, the ALJ did not commit reversible error by failing to address these listings.  See Pepper, 342 F.3d at 855.

**3.    The RFC Finding**

Mesteth contends that the finding that he has the mental RFC for light work is not supported by substantial evidence because the ALJ relied on the opinion of a non-examining consultant.  Medical evidence from an examining source is entitled to more weight than evidence from a consultant who has not examined the claimant.  Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).  "Although the ALJ bears primary responsibility for assessing a

18

claimant's residual functional capacity based on all relevant evidence, a claimant's residual functional capacity is a medical question." Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). To properly determine RFC, the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace and must consider evidence from a medical professional. Hutsell, 259 F.3d at 712.

In the mental RFC report based on Mesteth's records, Dr. Buchkoski checked the box indicating that Mesteth was not significantly limited in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods." (Tr. 123). Mesteth contends that this is contradicted by Dr. Swenson's finding that Mesteth scored in the 2nd percentile in the processing speed portion of the Wechsler Adult Intelligence Scale-III test. Thus, Mesteth contends that the ALJ erred in relying on Dr. Buchkoski's report for his RFC finding and using this mental RFC finding in the hypothetical questions posed to the vocational expert at step five.

Dr. Swenson noted that Mesteth's score in the processing speed test indicated that processing speed was significantly below average. "This may reflect impairment in attention and concentration." Id. (Tr. 111). Dr. Buchkoski's report indicates that Mesteth's ability to maintain attention and concentration for extended periods was "moderately limited." Thus, the

19

court finds that the opinions of the examining source and the consulting source are consistent, and that the ALJ did not err in relying on Dr. Buchkoski's report.  More importantly, Dr. Swenson concluded that Mesteth's "non-verbal intellectual abilities are largely within the average range."  (Tr. 111).  Accordingly, there is substantial evidence in the record to support the ALJ's finding that Mesteth has the mental RFC for light work.

Mesteth contends that the consulting physician failed to consider whether he could function outside his family's home or the supportive environment of a special education classroom.  Mesteth's sister reported that he made words up and that family members shopped and cooked for him.  But this was contradicted by Mesteth's own statements that he cooks meals and helps take care of his relatives.  It is the ALJ's responsibility to judge the credibility of the witnesses.  Thus, the ALJ did not commit a reversible error in relying on the consulting physician's report.  See Hutsell, 259 F.3d at 711 (RFC is a medical question).

**4.    Jobs that Mesteth Can Perform**

Mesteth contends that the ALJ erred in finding that he can work as a housekeeper or electronics worker because the VE relied on Dr. Buchkoski's report.  A VE's testimony is substantial evidence if it is based on a proper hypothetical question.  Brachtel v. Apfel, 132 F.3d 417, 419 (8th Cir. 1997).  If a hypothetical question does not relate all of the claimant's impairments, the

resulting testimony is not substantial evidence to support the ALJ's decision. Id. As noted above, Dr. Buchkoski's report adequately represented Mesteth's mental RFC. The ALJ asked the VE whether there were jobs that someone with Mesteth's mental RFC could perform. The VE opined that a person with Mesteth's mental impairments had the RFC to work as a housekeeper or electronics worker. Thus, the ALJ did not commit a legal error by basing his step five findings on the VE report.

Mesteth contends that the ALJ's hypothetical questions improperly required the ALJ to interpret medical evidence because the questions stated his hearing loss as a percentage at certain decibel levels. Mesteth relies on Cook v. Heckler, 739 F.2d 396, 399 (8th Cir. 1984), in which the Eighth Circuit noted that it is the ALJ's responsibility to identify a claimant's impairments. In Cook, the court cited (with the cf. signal) Baugus v. Sec'y of Health and Human Services, 717 F.2d 443, 447 (8th Cir. 1983), for the proposition that it was error to pose a hypothetical question that required the VE to make credibility findings, resolve conflicts in the evidence, and interpret medical reports.

In this case, the ALJ informed the VE that claimant "has hearing limitations that is [sic] severe to profound bilaterally. Speech reception threshold is 78 dBHL, aided, bilaterally, and word recognition is at 76% at 55dBHL, aided, bilaterally." These are the results of the hearing test that

21

Norman Sorensen, MA, performed on Mesteth when he was wearing his hearing aids.  Thus, the questions accurately reflect Mesteth's hearing limitations.  Unlike <u>Baugus</u>, the VE did not have to resolve conflicts in the medical evidence, make credibility findings, or interpret medical evidence.  The ALJ just told the VE what Mesteth's limitations are, as he is required to do.  <u>See</u> <u>Cook</u>, 739 F.2d at 399.  Because the ALJ's questions accurately conveyed Mesteth's hearing limitations, the VE's testimony is substantial evidence as to whether Mesteth can hear well enough to work as a housekeeper or electronics worker.  <u>Brachtel</u>, 132 F.3d at 419.  In any event, the VE opined that talking and hearing were not necessary to perform either job.

Mesteth contends that the ALJ's step five findings are not supported by substantial evidence because the VE's testimony that talking is not required contradicts the requirements listed in the DOT.  "Generally, when expert testimony conflicts with the DOT, it is the DOT which controls."  <u>Montgomery v. Chater</u>, 69 F.3d 273, 276 (8th Cir. 1995).  DOT classifications, however, may be rebutted by VE testimony which shows that the claimant can perform the particular job.  <u>Id.</u>

The DOT for the electronics worker has a GED which requires the ability to "[s]peak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses."  DICOT 726.687-010.  According to the housekeeper DOT

listing, a housekeeper must have a GED speaking level that would permit him or her to speak "simple sentences, using normal word order, and present and past tenses.   DICOT 323.687-014.

The VE testified that Mesteth could perform these jobs because hearing and speaking were not required.  The VE testified that job instructions could be transmitted in writing.  Because the VE testified that Mesteth could perform the jobs despite his limitations in hearing and speaking, it was not error for the ALJ to rely on the VE's testimony rather than the DOT.  Montgomery, 69 F.3d at 276.  Furthermore, under the physical demands of both jobs, the DOT provides that talking and hearing are "not present," meaning that the activity does not exist in those jobs.

**5.     Allegedly New and Material Evidence**

Mesteth argues that the case should be remanded for consideration of new and material evidence.  "In order to support a remand, new evidence must be 'relevant, and probative of the claimant's condition for the time period for which benefits were denied.'"  Estes v. Barnhart, 275 F3d 722, 725 (8th Cir. 2002) (citing Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (citation omitted).

On November 1, 2005, Mesteth was examined by Dave R. Johnson, M.D. Dr. Johnson found that Mesteth had a gait problem and severe hearing loss. The gait problem may have been hereditary because his family history was

23

positive for Charcot-Marie-Tooth disease.  Mesteth "does not have the typical phenotype for Charcot-Marie-Tooth, which is high arched feet, however, certainly some other sort of neuropathy is a possibility.  At any rate, he has significant impairment."  Dr. Johnson would limit Mesteth to non-significant ambulatory activity, and stooping, climbing, kneeling, lifting, carrying, hearing and speaking would be totally restricted.  South Dakota Disability Determination Services Report at 3 (Docket 18-2).

This new report is dated four-and-a-half years after his application for SSI and 22 months after the Appeals Council denied his appeal, making the ALJ's decision final.  Thus, the report is not material because it does not relate to the time period for which benefits were denied.  Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (psychiatric report dated eight months after appeals council decision is not material because it did not relate to time period for which benefits were denied).  Evidence that Mesteth had a disabling gait problem is not relevant to his claim that he was disabled by deafness.  Accordingly, Mesteth's motion for remand to consider new evidence is denied.

### CONCLUSION

The ALJ's conclusion that Mesteth was not disabled under the Act for any physical or mental impairment or combination of physical or mental impairments is supported by substantial evidence.  Accordingly, it is hereby

24

ORDERED that the Commissioner of Social Security's decision denying Melvin C. Mesteth's claim for supplemental security income under Title XVI of the Social Security Act is affirmed.

Dated May 16, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE